UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

Kimberly D. Carnahan,

    Plaintiff,

    v.

Carolyn W. Colvin,
Acting Commissioner of Social Security
Administration,

    Defendant.

Case No. 1:12-CV-427-JVB-RBC

## OPINION AND ORDER

Plaintiff Kimberly D. Carnahan seeks judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, who denied her application for Supplemental Security Income disability benefits under the Social Security Act. For the following reasons, the Court affirms the Commissioner's decision.

**A. Procedural Background**

On November 23, 2009, Plaintiff applied for disability insurance benefits alleging a disability onset beginning October 15, 2008. (R. at 142.)  The Administrative Law Judge ("ALJ") denied her claim initially on May 19, 2010, and upon reconsideration on July 22, 2010. (R. at 82–85, 91–93.) On April 18, 2011, Plaintiff received a hearing before ALJ Warnecke Miller. (R. at 38.) On May 9, 2011, the ALJ determined Plaintiff was not disabled and therefore not entitled to disability benefits. (R. at 32.) Her opinion became final when the Appeals Council denied Plaintiff's request for review on September 28, 2012. (R. at 1.)

**B. Factual Background**

**(1)** *Plaintiff's Background and Testimony*

Plaintiff was born in 1971. (R. at 142.) She has some college education. (R. at 257.) Plaintiff is the primary caregiver for two minor children. (R. at 176.) She also has a live-in boyfriend of several years, who sometimes helps Plaintiff care for her children. (R. at 176–177.) Plaintiff met and started dating her boyfriend almost a year after her alleged onset date. (R. at 195.) Plaintiff sees her father about once or twice per week. (R. at 186.) Plaintiff completes basic household chores such as grocery shopping, dish washing, and clothes washing, with limited assistance from her minor children. (R. at 175–77.) She cares for a small terrier dog. (R. at 176.) However, she asserts difficulties caring for her own basic needs, such as washing and dressing herself. (R. at 176.)

Before 2008, Plaintiff worked as a bartender, waitress, and legal secretary both full-time and part-time. (R. at 19–20, 350.) The bartender and waitress work required she mostly stand during her shifts, while the legal secretary job allowed her to sit for much of the day. (R. at 50–51.) Neither job required Plaintiff to lift more than ten pounds. (*Id.*)

In 2005, she started working full-time for her friend's family's flower shop. (R. at 45, 229.) Her duties included updating the website, taking outside business orders, networking, managing human resources, overseeing the family's rental properties, and caring for the owner's mother. (R. at 45, 51.) This job required that Plaintiff sit for about three to five hours per day and lift about ten pounds. (R. at 50–51.) In 2009, she earned a salary of more than $2,104 per month, while working for this shop for four full quarters. (R. at 151, 157.)

Although she alleges an onset date of October 15, 2008, Plaintiff continued to work at the flower shop for about sixteen months until February 1, 2010. (R. at 229.) The shop's owner, Tom

2

Sherer, claimed Plaintiff was unable to perform her flower shop duties adequately.[1] Plaintiff said that she received special considerations, such as frequent absences, lower quality of accepted work, fewer hours, and more breaks. (R. at 225.) Mr. Sherer said he hired Plaintiff because she is his daughter's friend and became "like a family member." (R. at 227.) Plaintiff has been unemployed since she stopped working at the flower shop on February 1, 2010. (R. at 229.)

Plaintiff testified that she usually only leaves her house in intervals of two to four hours twice per week—once to visit a doctor and once to shop for groceries. (R. at 62–63.) She stated there are consequences for leaving the house, such as needing extra sleep and feeling "wiped out." (R. at 62.) She further claimed her depression keeps her at home unless she has to leave, because she has no more friends. (*Id.*) Plaintiff said she hardly ever drives, and someone else usually drives for her. (R. at 66.)

Also, Plaintiff cannot crouch to pick things off the floor because this causes her to fall, but she can usually get around this problem by grabbing something from her left side. (R. at 59.) Plaintiff said she has trouble lifting things, and her tremors make holding and moving things difficult. (R. at 63.) She stated she has memory issues, problems following verbal instructions, and trouble moving her neck. (R. at 66–67.) Plaintiff also stated she gets double vision and sees black spots, but she never visited an eye doctor. (R. at 65.)

**(2)** *Medical Evidence*

Plaintiff alleges severe, medically determinable impairments of relapsing-remitting multiple sclerosis ("MS"), degenerative disc disease of the cervical spine at C5–C6 with disc protrusion, fibromyalgia, celiac disease, sleep stage dysfunctions, depression, panic disorder, and post-

---

[1]   (R. at 226.) When asked to explain why Plaintiff's work was considered unsatisfactory, Mr. Sherer stated "what work[?]" (*Id.*)

traumatic stress disorder ("PTSD"). (R. at 25.)

(a) *Severe Physical Impairments*

Plaintiff visited radiologist Dr. Edward Weber in January 2005 for a magnetic resonance imaging ("MRI") scan of the cervical spine, and Dr. Weber noted a posterior disc protrusion at C5–C6. (R. at 493.) Internist Dr. Steven Mooibroek ordered an MRI of the head, which was performed in April 2006. (R. at 484–85.) Dr. Bessette, a radiologist, identified white lesions of the cervical cord at C1–C3, consistent with MS plaques, along with degenerative disc disease at C5–C6 and diffuse disc bulging. (R. at 484.) In May 2006, Plaintiff saw neurologist Dr. Ajay Gupta for evaluation of possible MS. (R. at 477.) Dr. Gupta gave a "questionable diagnosis" of MS. (R. at 478.) In August 2006, after several months of testing, Dr. Gupta diagnosed her with MS. (R. at 446–47.)

More than six months later, in February 2007, Plaintiff saw neurosurgeon Dr. Isa Canavati, who confirmed degenerative disc disease and central disc protrusion at C5–C6 diagnoses, as well as her history of MS. (R. at 436.) Dr. Canavati referred her to neurologist Dr. David Lutz to address her chronic neck and upper right shoulder girdle region pain. (R. at 427–26, 436.) Dr. Lutz performed multiple trigger point injections and prescribed a comprehensive spine rehabilitation program. (R. at 427–29.) In February 2008, Dr. Gupta noted symptomatology of spotty vision, reported ongoing treatment for relapsing-remitting MS, and proposed disease-modifying therapy. (R. at 305–06.) In November 2009, Dr. Gupta reported Plaintiff's MS was in remission but diagnosed her with fibromyalgia. (R. at 260.)

About three months later, in January 2010, neurologist Dr. Lael Stone recommended MRI scans of Plaintiff's cervical and thoracic spine, but the scans were negative for lesions. (R. at

396–400.) Next, orthopedist Dr. Russell De Micco diagnosed her with degeneration of cervical and intervertebral discs but did not believe spinal surgery or injections were needed. (R. at 386–88.) On that same date, rheumatologist Dr. Quingping Yao attributed Plaintiff's pain to fibromyalgia and suggested physical therapy. (R. at 379.) Also, Dr. Stone noted Plaintiff's MS appeared stable, indicated Plaintiff's fatigue might be secondary to sleep apnea, and ordered polysomnography testing. (R. at 371–75.) Later that month, neurologist Dr. Silvia Neme-Mercante diagnosed her with sleep stage dysfunctions. (R. at 369–70.) In June 2010, primary care physician Ashraf Hanna performed a wellness exam and diagnosed Plaintiff with MS, fibromyalgia, and celiac disease. (R. at 501–02.)

(b) *Severe Mental Impairments*

In September 2009, Plaintiff saw neuropsychologist Dr. Tasha Williams for a neuropsychological evaluation. (R. at 256.) Dr. Williams noted symptoms of depression and concluded Plaintiff had cognitive changes secondary to MS. (R. at 258.) In December 2009, psychiatrist Dr. Valsa Ouseph diagnosed her with major depression. (R. at 314.) A few days later, psychological counselor Tosha Gearhart diagnosed Plaintiff with PTSD and anxiety. (R. at 553.) Later that month, psychiatrist Dr. Ronald Pancner diagnosed her with bipolar II disorder and PTSD. (R. at 545.)

(c) *Medical Opinions*

As for the opinion evidence, Dr. Revathi Bingi examined Plaintiff psychologically in March 2010. (R. at 325.) Dr. Bingi diagnosed her with major recurrent depression, panic disorder without agoraphobia, and PTSD. (R. at 328.) Dr. Bingi also noted that her mental examination

5

performance revealed she could focus on tasks and had no cognition problems. (R. at 329.)

In April 2010, non-examining state psychological consultant Dr. Amy Johnson reviewed the record. (R. at 331.) Dr. Johnson diagnosed Plaintiff with major depressive disorder and anxiety. (R. at 338, 340.) She decided that Plaintiff can understand, remember, and carry-out at least simple tasks; relate on a superficial level with co-workers; attend to tasks for a sufficient period of time to complete the tasks; and manage the stress involved with at least simple work. (R. at 334.) The next day Plaintiff visited Dr. Ben Williams, who completed a physical examination at Social Security Administration's request. (R. at 349.) Dr. Williams diagnosed her with MS and neurological deficits regarding cerebellar testing and noted she did not lose gait coordination. (R. at 350.)

Later that month, state agency medical consultant Dr. R. Bond completed a physical residual functional capacity ("RFC") test. (R. at 355, 362.) Dr. Bond found Plaintiff partially credible and that she could lift and carry twenty pounds occasionally but ten pounds frequently. (R. at 356, 360.) He also determined that Plaintiff could stand or walk for about six hours in an eight hour work day and sit for about six hours in an eight hour work day, with normal rest periods and some postural limitations. (R. at 355.)

Almost three months later, in July 2010, state agency psychological consultant Dr. Joseph Pressner reviewed and affirmed Dr. Johnson's April 2010 assessment. (R. at 412.) Later in the month, state agency medical consultant Dr. J. Sands reviewed and affirmed Dr. Bond's April 2010 assessment. (R. at 412.)

**(3)** *Vocational Expert's Testimony*

Vocational expert Sharon D. Ringenberg ("VE") testified at Plaintiff's April 18, 2011,

hearing before the ALJ. (R. at 68–78.) The VE classified Plaintiff's former jobs of office manager as semi-skilled and light, legal secretary as skilled and light, and bartender and waitress as semi-skilled and light. (R. at 69, 232).

The ALJ provided the VE with four hypotheticals to evaluate, all including Plaintiff's age, education, and work experience. (R. at 66–71.) The first scenario also incorporated the limitations from Dr. Bond's RFC assessment, as well as a lack of neck movement. (R. at 71–72, 356, 360; *see supra* at 3.) The VE opined that the individual in the first scenario could not perform Plaintiff's past work, which was light and skilled or semi-skilled or any other work in the national or regional economy solely because the hypothetical individual could not move her neck. (R. at 71–72.)

Next the ALJ adjusted the hypothetical by changing the hypothetical individual's neck twisting to occasional. (R. at 72.) The VE explained that changing this limitation would allow the hypothetical individual to perform Plaintiff's past jobs. (R. at 72.) Next, the ALJ built a hypothetical on the basis of the second but added that this person struggles with concentration and a fast pace, languishes under sudden or unpredictable work place changes, requires a tempo that is limited to goal oriented standards, and tolerates interacting with the public but is unable to address complaints or other concerns. (R. at 72–73.) The VE determined this would preclude employment in Plaintiff's previous jobs, but the individual could work as an office helper, retail marker, and hand folder. (R. at 73.)

Additionally, the ALJ proposed a hypothetical with the restrictions from the third hypothetical and added that this person would consistently require four unscheduled absences per month. (R. at 74.) The VE opined that four unscheduled absences per month is a significant limitation sufficient to preclude all employment. (*Id.*)

7

Further, counsel for Plaintiff proposed a fifth hypothetical. (R. at 74–76.) He added to the second hypothetical a slower pace requirement. (R. at 77.) The VE determined this reduced-speed requirement would prevent the hypothetical individual from performing the waitress and bartender job. (R. at 77.)

**(4)** *ALJ's Decision*

On May 9, 2011, the ALJ decided that Plaintiff was not disabled. (R. at 32.) The ALJ determined that Plaintiff had multiple severe impairments: relapsing-remitting MS; degenerative disc disease of the cervical spine at C5-C6 with disc protrusion; fibromyalgia; celiac disease; sleep stage dysfunctions; depression; panic disorder; and PTSD. (R. at 22–23.) Nonetheless, these did not meet any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. (R. at 23–24.)

Further, the ALJ found that, although she worked for her friend's family for several months after the alleged onset date and earned more than $2,104 per month, Plaintiff had not engaged in substantial gainful activity since October 15, 2008, nor was she able to perform her past work since then. (R. at 22, 30.) However, the ALJ questioned Plaintiff's credibility by finding inconsistencies between her alleged functional limitations and her employment, activities, and socialization. (R. at 25–26.)

The ALJ determined she could perform light work with the exceptions listed in Dr. Bond's RFC assessment. (R. at 30–32). The ALJ concluded that, given Plaintiff's age, education, work experience, and residual functional capacity, there were other jobs that existed in significant numbers that the Plaintiff could perform. (R. at 31.)

**C. Standard of Review**

This Court has the authority to review Social Security Act claim decisions under 42 U.S.C. § 405(g). The Court will uphold an ALJ's decision if it is reached under the correct legal standard and supported by substantial evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of such "evidence as a reasonable mind might accept as adequate to support a conclusion." *KS Energy Servs., LLC v. Solis*, 703 F.3d 367, 371 (7th Cir. 2012). This Court will not reconsider facts, re-weigh the evidence, resolve conflicts in the evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). However, this Court will ensure that the ALJ built an "accurate and logical bridge from the evidence to his conclusion" so a reviewing court may assess the validity of the agency's ultimate findings and provide meaningful judicial review. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

**D. Disability Standard**

To qualify for SSI disability benefits, claimants must establish they suffer from a disability. A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Administration established a five-step inquiry to evaluate whether a claimant qualifies for disability benefits. A successful claimant must show:

> (1) he is not presently employed; (2) his impairment is severe; (3) his impairment is listed or equal to a listing in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) he is not able to perform her past relevant work; and (5) he is unable to perform any other work within the national and local economy.

*Scheck v. Barnhart,* 357 F.3d 697, 699–700 (7th Cir. 2004).

An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter,* 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

**E. Analysis**

Plaintiff's argument is that the ALJ improperly evaluated her symptom testimony. (DE 16 at 17.) This Court must decide whether the ALJ reached her credibility assessment under the correct legal standard and supported her decision by substantial evidence—that is, evidence that is reasonably adequate to support the ALJ's conclusions. *See Briscoe*, 425 F.3d at 351; *Richardson v. Perales*, 402 U.S. 389, 401 (1971). For the reasons explained below, the Court affirms the ALJ's decision.

**(1)** *The ALJ's Assessment of Plaintiff's Credibility Is Not Patently Wrong.*

Plaintiff claims the ALJ erred in her assessment of Plaintiff's credibility because she "cherry-picked" the evidence from Plaintiff's former employer that favored her decision and improperly considered her daily activities. (DE 16 at 19–20.) Plaintiff further asserts that the ALJ failed to sufficiently consider the Plaintiff's testimony, as well as her father's and boyfriend's written reports. (*Id*. at 20.) The Court disagrees and finds that the ALJ adequately supported her decision with specific facts from the record before she concluded that Plaintiff's complaints were not entirely credible.

"Because the ALJ is in the best position to observe witnesses," courts will not disturb an ALJ's "credibility determinations as long as they find some support in the record." *Dixon v. Massanari*, 270 F.3d 1171, 1178–79 (7th Cir. 2001). Likewise, courts "will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (citation omitted). "Patently wrong" is a high burden. *Turner v. Astrue*, 390 Fed. Appx. 581, 587 (7th Cir. 2010). "An ALJ's credibility determination need not be flawless." *Adams v. Astrue,* 880 F. Supp. 2d 895, 904 (N.D. Ill. 2012) (citing *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2008)). "It is only when the ALJ's determination lacks any explanation or support that [courts] will declare it to be 'patently wrong' . . . and deserving of reversal." *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008) (citations omitted).

Here the ALJ determined Plaintiff had the RFC to perform light work with a few exceptions. (R. at 31–32.) The ALJ summarized her credibility findings stating "[t]here is some question as to the claimant's credibility with regard to the issue of her alleged functional limitations due to various inconsistencies in the record." (R. at 25.) The ALJ needed to support this statement with an explanation and sufficient evidence from the record. *See Dixon*, 270 F.3d at 1178–79. The Court finds that the ALJ sufficiently explained her decision with enough record evidence.

(a) *The ALJ Did Not "Cherry Pick" Evidence That Only Favored Her Ultimate Conclusion.*

The ALJ did not "cherry pick" and use only the evidence from Plaintiff's former employment which favored her ruling. The ALJ noted that Plaintiff earned $25,250 from working at the flower shop in 2009. (R. at 22.) Despite this being more than double the minimum substantial

gainful activity level for this year,[2] the ALJ still counted this as below substantial gainful activity on the basis of the flower shop owner's written testimony regarding the low-quality of Plaintiff's work. (*See id.* (agreeing with the flower shop owner that Plaintiff performed work below the substantial gainful activity level despite her earning more than the threshold for substantial gainful activity).) If the ALJ only "cherry picked" evidence that favored her ruling, the Plaintiff would not have even made it past the second step of the disability analysis.

(b) *The ALJ Doubted Plaintiff's Credibility and Provided Reasons for This Doubt.*

The ALJ used various facts and observations in deciding the weight to give Plaintiff's testimony. First, she found Plaintiff's reported symptoms and her testimony about her inability to sustain gainful employment to be inconsistent with her prior employment record. (R. at 25.)  The ALJ can use Plaintiff's ability to work a part-time job, although below substantial gainful activity level, to discredit Plaintiff's testimony if the ALJ found it inconsistent with the plaintiff's claims. *See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (finding that although plaintiff was not at his best at work, his ability to perform some work on a part-time basis hurt his total disability claim).

While Plaintiff claimed she was unable to sustain gainful activity, the evidence shows she worked at least part-time at the flower shop for about sixteen months after the alleged onset date. (R. at 226.)

Further, she performed the work of an office manager for eight hours per day, five days a week, paying bills, managing payroll, and responding to online order requests after the alleged onset date. (R. at 45–46; 169.) This level of activity could be inconsistent with Plaintiff's claims

---

[2] S*ee  Monthly Substantial Gainful Activity Amounts by Disability Type*, Soc. Sec. Admin., http://ssa.gov/oact/cola/sga.html (last visited Nov. 7, 2013) (reporting the non-blind substantial gainful activity threshold as $980 per month).)

of total disability and that she is often unable to get out of bed—especially in the winter—because her employment after the alleged onset date took place during some of the colder months of the year. (R. at 229.)

Second, the ALJ sufficiently explained how Plaintiff's daily activities are inconsistent with her testimony and reported symptoms. The ALJ explained that Plaintiff is the primary care giver for her two minor children. (R. at 176.) She also takes care of a small dog. (*Id.*) She can complete basic household chores such as grocery shopping, dish washing, and clothes washing, "with assistance." (R. at 175–77.)

But Plaintiff failed to prove the degree of assistance she received from her children and boyfriend was complete or substantial. She stated that he does not do anything to help the children except meet their "basic" and "daily" needs." (R. at 175–176.) She also said that her boyfriend "takes [her] children to their activities [and] watches them" when she cannot. (R. at 176.) Also, Plaintiff claims that she does the laundry and washes dishes every week, and her children get her the hangers and their dirty clothes. (R. at 177.) This is very limited assistance, and Plaintiff must still substantially complete these chores by herself.

Although she can care for a household of two children and a dog with both undefined and very limited assistance, Plaintiff asserts problems with leaving the house and caring for her own basic needs, such as dressing and washing herself. (R. at 176.) The ALJ could properly conclude that Plaintiff's ability to handle these responsibilities contradicts her symptom and residual function claims.

Finally, the ALJ could properly find Plaintiff's social functioning testimony inconsistent with other evidence on the record. The ALJ acknowledged Plaintiff's claims to have significantly reduced social functioning, and she also says she has no more friends. (R. at 62.) However, the

ALJ explained that Plaintiff lives with and maintains a relationship with her boyfriend. (R. at 175.) Further, she did not even meet her boyfriend until more than a year after her alleged onset date. (R. at 195.) Thus, Plaintiff had enough social functioning ability to court her now boyfriend during this time when she claimed she lost all her friends. Therefore, the ALJ could accurately find Plaintiff's claims inconsistent with her actual social functioning abilities.

The ALJ could reasonably find that Plaintiff's ability to work at least part-time, perform household chores, care for her minor children and a dog, and court and maintain a relationship with her boyfriend undermines her credibility regarding her symptom testimony. The ALJ used evidence from the record to support this conclusion, and therefore, it is not patently wrong.

**(2)** *The ALJ Based Her Decision on Substantial Evidence.*

Plaintiff also claims that the ALJ did not ground her decision on substantial evidence. (DE 16 at 22.) Plaintiff discussed some evidence from herself, her boyfriend and her father that showed her limitations. (*See Id.* at 20–22.) But the record contains substantial evidence to support the ALJ's finding that Plaintiff could perform a significant number of jobs despite her functional limitations.

A claim for disability benefits cannot be supported by the claimant's subjective complaints alone. 20 C.F.R. § 404.1529(a). The ALJ found that Plaintiff had several physical, mental, and social limitations, supported by the statements of Plaintiff, her boyfriend, and her father, but concluded that none of these impairments met or equaled the required listing. (R. at 25–26.) In doing so, the ALJ weighed the findings recorded by Plaintiff's physical and mental examiners. (R. at 26–30.) The ALJ took into account Plaintiff's testimony as well as her boyfriend's and father's statements about Plaintiff's daily activities. (R. at 25–26.) The ALJ discussed all these

factors and provided substantial evidence to support her ruling.

The ALJ determined that Plaintiff could not perform her previous work duties, but she found that Plaintiff had the residual functional capacity to complete light work with limitations. (R. at 30–32.) The ALJ principally relied on the opinions of two reviewing state agency physicians who opined that Plaintiff could perform simple work that required minimal physical exertion and only superficial contact with others. (R. at 29–30, 334, 356.) Plaintiff offered no competing medical opinions to challenge these findings, as her treating physicians' reports were consistent with the state reviewing doctors' opinions and partially supported the ALJ's conclusion.

The ALJ also considered Plaintiff's pain complaints during the hearing in conjunction with Plaintiff's testimony about her daily activities. (R. at 25–26.) After evaluating the evidence, the ALJ concluded that Plaintiff's statements about the intensity, persistence, and functionally limiting effects of her pain and symptoms were not substantiated by the Plaintiff's daily activities or objective medical evidence. (*Id.*) The ALJ did not err by relying on the opinions of the two agency physicians and the lack of evidence to the contrary.

The ALJ considered the written medical and symptom testimony, Plaintiff's and VE's oral testimony, and Plaintiff's boyfriend's and father's written testimony. This amount of testimony, both written and oral, from people who professionally examined and know Plaintiff is substantial evidence. The ALJ relied on this substantial evidence in reaching her conclusions and therefore based her decision on substantial evidence.

## F. Conclusion

The Court finds that the ALJ's findings are supported by substantial evidence. The ALJ found that Plaintiff's medical evidence did not meet the disability standard. She also did not find

Plaintiff's subjective complaints credible. The ALJ provided reasons using evidence from the record for these findings. Therefore, the Court affirms the ALJ's decision.

SO ORDERED on March 5, 2014.

s/ Joseph S. Van Bokkelen  
Joseph S. Van Bokkelen  
United States District Judge
